[Civ. No. 2217.   Fourth Appellate District.—May 11, 1938.]

In the Matter of the Estate of JOE S. DeBRUM, Deceased. FELIX SIMAS, Appellant, v. MARY SOARES, Administratrix, etc., Respondent.

John T. de Freitas and J. C. C. Russell for Appellant.

Thomas F. Lopez and Sidney J. W. Sharp for Respondent.

HAINES, J., *pro tem.*—Joe S. DeBrum died a resident of Kings County on July 18, 1936, intestate and leaving estate therein.  He had never been married and left no issue nor parents surviving, his heirs at law being five sisters, one of whom is Carolina V. Cardoza, and sundry nephews and nieces whose parents, as we gather from the findings, must be deceased.  Appellant Felix Simas is one of these nephews.

Appellant Simas and respondent Mary Soares, who is a daughter of the said Carolina V. Cardoza, each filed a petition for letters of administration upon the decedent's estate, Mary Soares being the nominee of her mother, Mrs. Cardoza, and, upon the two petitions coming on to be heard together, as contemplated by section 442, Probate Code, the court granted the petition of respondent Mrs. Soares for letters and denied the petition of appellant. From this order the present appeal is prosecuted.

In the order of priority in the right to letters of administration upon an intestate's estate laid down by section 422, Probate Code, brothers and sisters entitled to succeed to all or some part of the estate are placed in the fifth class, and others described as "next of kin entitled to share in the estate" in the sixth class. Formerly, by the express provision of subdivision 1 of section 1365, Code of Civil Procedure, it was mandatory on the court when a surviving spouse was entitled to succeed to some part of the estate to appoint him or her or his or her nominee, if competent, in preference to anyone else. (*Estate of Dorris,* 93 Cal. 611 [29 Pac. 244]; *Estate of Richardson,* 120 Cal. 344 [52 Pac. 832]; *Estate of Dow,* 132 Cal. 309 [64 Pac. 402]; *Regents* v. *Turner,* 159 Cal. 541 [114 Pac. 842, Ann. Cas. 1912C, 1162]; *Estate of Martin,* 163 Cal. 440 [125 Pac. 1055].) That situation is perpetuated by subdivision 1 of the present section 422, Probate Code. Contrariwise, however, it was held that the provision of former section 1379, Code of Civil Procedure, to the effect that "administration *may* be granted to one or more competent persons, although not otherwise entitled to the same, at the written request of the person entitled, filed in court", was, except as to nominees of the surviving spouse, permissive only, and that the court had the discretionary right, instead of acting upon it, to appoint applicants of classes subsequent in priority to the one making the nomination. (*Estate of Myers,* 9 Cal. App. 694 [100 Pac. 712]; *Estate of Meier,* 165 Cal. 456, 461 [132 Pac. 764, Ann. Cas. 1914D, 121, 48 L. R. A. (N. S.) 858].) It is, however, now provided by section 423, Probate Code, that:

"Administration may be granted to one or more competent persons, although not otherwise entitled to the same, at the written request of the person entitled, filed in court. If the person making the request is a child, parent, brother or

sister of the decedent, the nominee shall have priority next after those in the class of the person making the request; otherwise the court, in its discretion, may appoint either such nominee or a person of a class subsequent in rank to that of the person making the request; but other persons of the class of the person making the request shall have priority over such nominee.''

It is said in *Estate of Somerville,* 12 Cal. App. (2d) 430, 432 [55 Pac. (2d) 597], that: ''the section plainly gives priority to a competent nominee of a child, parent, brother or sister of a decedent over persons in subsequent classes; and it is only as to the latter classes that the court may in its discretion appoint either a nominee or a person of a class subsequent in rank to that of the person making the request''.

In 11A California Jurisprudence, pages 335, 336, the subject is discussed in the following language:

''This section of the Probate Code is largely new legislation in the construction of which the older decisions leave some questions open and debatable, and it is necessary to construe the present statute in the light of the conditions which preceded it. The opening words, 'administration may be granted', in section 423 signify an element of discretion limited by what follows. As appears from the succeeding words of that section nominees of a 'child, parent, brother, or sister' have a priority which does not seem to be subject to the discretion given to the court over nominations by other 'persons entitled'. A fair construction of the present statute seems to be that appointment of a competent nominee of a child, parent, brother or sister (if in rank next after the nominator's class) is imperative; that it is discretionary to appoint either the nominee or one of any class lower than the nominator's, if the nomination be by any person in the sixth and lower classes; in any case it is imperative to prefer other members of the same class to the nominee of a class member. But all this is for the courts to decide.''

Without intending at this time to go farther in the construction of the present statute, section 423, Probate Code, with respect to the suggestions in the language from California Jurisprudence just quoted than the court went in *Estate of Somerville, supra,* or farther than is strictly required for the decision of the present case, we here express our accord with the view expressed in the Somerville case

that, *prima facie,* the nominee of a sister of a decedent, if the sister succeeds to any part of the decedent's estate, is now entitled, as of right and not as a matter of the court's discretion, to be preferred to a nephew, even though the nominee have no right to any part of the estate while the nephew is entitled to share in it or some part of it. This is *prima facie* the situation. Of course, the nomination may be rejected if the nominee is incompetent. That follows from the language of section 442, Probate Code, as it was held to follow from the former section 1374, Code of Civil Procedure. Under this section of the Code of Civil Procedure, however, it was held that incompetency was the only ground for rejecting the application of one otherwise entitled to letters and the grounds for declaring an applicant incompetent were held to be those only which were specified in the former sections 1350 and 1369 of that code, corresponding to the present sections 401 and 420, Probate Code (*Estate of Bauquier,* 88 Cal. 302 [26 Pac. 178, 532] ; *Estate of Muersing,* 103 Cal. 585 [37 Pac. 520] ; *Estate of Carmody,* 88 Cal. 616 [26 Pac. 373] ; *Estate of Brundage,* 141 Cal. 538, 540 [75 Pac. 175] ; *Estate of Randall,* 177 Cal. 363, 366 [170 Pac. 835] ), whereas it is now held that the inclusion in section 442, Probate Code, of the words ''or for other cause'' gives the court the right, in the exercise of a sound discretion, to refuse an appointment to an applicant generally entitled, though such refusal be for other reasons than incompetency. (*Estate of St. John,* 8 Cal. (2d) 175 [64 Pac. (2d) 725].) In the case last cited the refusal was based on the circumstance that the person who had nominated the applicant made claims adverse to the estate with respect to certain property and was prosecuting an action to enforce the same.

From what we have said it results, in the instant case, that respondent Mary Soares appeared to be *prima facie* entitled, as of right and not merely as a matter of the court's discretion, to be preferred to appellant in the grant of letters. To overcome such showing it was incumbent upon appellant to establish that respondent was under some disqualification sufficient in its nature and extent to warrant the court in overriding what, but for the disqualification, would be her right to letters. Appellant in his formal objection to her appointment asserts that she is incompetent ''by reason of her improvidence, want of understanding, and want of integ-

rity''. The evidence does not show that she has been or is either improvident or deficient in understanding or wanting in general integrity, and the only arguable ground for claiming that letters should have been denied her, although that is not pleaded in terms in the objections filed, is that her mother, Mrs. Cardoza, by whom she was nominated, is possessed of interests adverse to the estate.

Appellant's claim concerning Mrs. Cardoza's alleged adverse interests is based in part on the testimony of one Rose Finch and in part on his own testimony. Rose Finch had formerly been married to a brother, since deceased, of the said Joe S. DeBrum. She testified to the effect that after this brother's death she, as his widow, took charge of Joe S. DeBrum's affairs and, in doing so, came into possession of about $6,700 worth of personal property, part in cash and part in notes, all belonging to the said Joe S. DeBrum. She further testified that she turned over all this property not to the said Carolina V. Cardoza but, at the written request of the said Joe S. DeBrum, to Mrs. Cardoza's then husband, a Mr. Cardoza, and that the assets so turned over to Mr. Cardoza included a note referred to as amounting to $224.75 signed by appellant Simas which, so far as she, Mrs. Finch, knows, has never yet been paid. In addition to what was said by Mrs. Finch, it appears from appellant's testimony that some years ago Mr. Cardoza (since deceased but at that time, as stated, the husband of respondent's nominor) and the decedent Joe S. DeBrum, together bought 20 acres of land, each taking a half interest therein. There is nothing in the record to indicate that Mr. Cardoza did not pay his full half of the purchase price and there is testimony in the record that he did. Appellant was allowed to go on and testify that Mrs. Cardoza had, about a year ago, told him that after this purchase Joe S. DeBrum had left five or six thousand dollars in the bank. With respect to this, appellant's testimony includes the following:

''Q. Now, you say Mrs. Cardoza told you the money was in the bank for Brum after the land was bought? A. He had it but he had spent it. He told me—my aunt told me he had about between four and five thousand dollars in the bank after he bought that place and paid for it, my uncle's money. Q. The First National Bank— A. He had it on the First National Bank and I think a thousand dollars in

the Lemoore Bank and some on the Cardoza Bank over at Riverdale. The Court: I didn't get the amounts, there. A. This money is divided, I believe, in the First National at Lemoore, and some in the First National of Hanford, and some money, between fourteen hundred dollars, over at Frank Brown's at Riverdale. The Court: Altogether it would be how much? A. Between four and five thousand dollars. Q. She told you that about a year ago? A. Yes, just about a year ago. But he had spent it. Q. Just a minute now. That he had spent it. A. He told me he had spent it, himself. Q. Who told you? A. Mrs. Cardoza. Mr. Russell: When he says, 'He', he means 'she'."

At an earlier point in his testimony appellant had described Mrs. Cardoza as speaking in her conversation with him about the money as follows:

"Q. Yes, what did she tell you? A. Told me, bought the place together, this 20 acres, and used some of this money to run the place together, and the uncle the time he went out looking for Frank Brown, he came back to Riverdale and he left between eight and nine hundred dollars, I don't know exactly, then kept going back making his living. Asked him, 'You know that's bad thing to do?' He says, 'Well, we spent the money. We ain't got it. If anybody ask me, I say we spent it.' . . . Q. Mrs. Cardoza told you that? A. Yes, sir."

It is apparent that, in trying to quote Mrs. Cardoza, appellant, who spoke through an interpreter, at times at least, used the word "he" where he meant "she".

From appellant's testimony it would seem that after the land purchase above referred to the deceased Joe S. DeBrum had lived for something like a year with the Cardozas. The admission which appellant attributed to Mrs. Cardoza about the spending of decedent's money may have been taken by the trial court to amount to no more than a statement that while the deceased and the Cardozas were living together whatever money the deceased may have had left after paying his part of the purchase price of the land was, with his concurrence and consent, spent in running the place.

It appears from the evidence that at a later time the deceased lived for five or six years with his nephew, the appellant, and died while still residing with him. Some time before his death he deeded his half interest in the above-men-

tioned 20 acres to appellant in consideration, according to the latter, of appellant's agreement to maintain him for the rest of his life. It further appears that a short time before decedent's death appellant, through one of his attorneys, collected $250 on an account due decedent and that after satisfying therefrom the attorney's charges he devoted the rest to buying a bed, taking care of some grocery bills of the deceased and employing for him a nurse.

In respondent's petition for letters she describes the decedent's estate as consisting of an undivided half of the 20 acres referred to and $250 in cash. Her manifest intention was to set out as belonging to the estate the half interest in the 20 acres that appellant now claims as having been deeded to him by his uncle, plus the $250 just mentioned as collected by appellant on his uncle's account and disbursed. Respondent makes no mention of any of the money or assets of the deceased said to have been turned over by Mrs. Finch to the late Mr. Cardoza, her nominor's husband.

It is claimed on appellant's part that respondent's conduct displays a studied effort on behalf of her mother, Mrs. Cardoza, to suppress an indebtedness from the latter to the deceased and, therefore, that respondent's application for letters should have been refused. Not only does it appear to us that any evidence that Mrs. Cardoza herself ever had any possession of any of the decedent's money or other property is exceedingly tenuous, but had the court granted letters to appellant, respondent might with about the same degree of plausibility that now attends appellant's objections, have made some such claim as may have been indicated by her petition that appellant is not entitled to retain the interest in the 20 acres acquired by him through the deed from his uncle, or that he ought to turn over to the estate the $250 above referred to, and that, by reason of these circumstances he is not entitled to the appointment.

Appellant further suggests that there has been a copartnership between respondent's mother and the decedent which should be treated as disqualifying respondent for appointment. This claim is based merely on the circumstance that there once existed a cotenancy in the 20 acres referred to between decedent and Mr. Cardoza and that Mr. Cardoza's former interest now belongs to respondent's mother. Manifestly, no partnership of any sort was shown.

Viewing the situation as a whole and conceding that the court had the discretionary power to refuse to grant letters to respondent, even though otherwise entitled to them and a competent person, had it believed her interests so adverse to those of the estate that such action would prejudice its rights, and conceding further that respondent, so far as any adverse interest is concerned, must be treated as standing in the same position as her mother and nominor (*Estate of Connick,* 189 Cal. 498 [209 Pac. 356]) we are yet unable to see that appellant's showing was so cogent as to indicate on the part of the trial court any abuse of discretion.

The order appealed from is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 8, 1938.